Next case on our docket is Moore v. Radae. You can tell me how to pronounce that. 5-24-0795. Appellant, when you are ready to proceed, you may do so, and please identify yourself for the record. Thank you, Your Honor. Good afternoon. May it please the Court, my name is April Bott, and I have the honor of being both the plaintiff, appellant in this case, and the one arguing it. I filed this case in 2017 against Illinois resident Sherry Radee, pursuant to the Illinois Alienation of Affection Act. While the statute has sunsetted, the parties have agreed and the trial court held that the events giving rise to this action occurred in 2015 before the statute terminated. The alienation statute requires only that I carry the civil burden of proof to establish three elements, which the trial court determined that I had. First, there was love and affection between the spouses. Defendant Radee set this time frame for the Court in the Court's analysis as April and May of 2015, when their affair began, Ms. Radee's affair with my ex-husband. The second element is that Ms. Radee had to commit overt acts, conduct, or enticement that caused the affections of my husband to leave. Again, certainly the trial court believed that she did. And Ms. Radee, again, set the time frame for the analysis for the trial court as April to September of 2015. And the third element of the alienation is merely that I demonstrate actual damages, which in this case is not contested, and it's $10 million, which was my husband's annual salary as the CEO of Foresight Energy and Murray Energy. As a logical starting point, there is no question that the Court's May 2024 decision held that defendant violated the alienation statute. Specifically, on page 1, the Court stated, During and after the takeover, an affair began between Ms. Radee, the defendant, and Mr. Moore that led to the disillusion of plaintiff's marriage. Then, on page 2 of the decision, the Court expressly held that this affair led to the disillusion of the marriage, stating, The gist of the plaintiff's claim is that Ms. Radee intentionally set out to steal plaintiff's husband, as defendant realized she was likely going to lose her good-paying job when the corporate takeover was completed. This Court does not disagree with this analysis, and there is, quote, plenty of evidence to support it. Namely, Ms. Radee's text about losing her job, the $100,000 bonus more than her actual salary that she received when the affair became known by other corporate personnel, and most of all, the anonymous letter sent to plaintiff alerting her of the affair, which the Court concludes were sent by defendant Radee. And then again on page 2 of footnote 4, the Court specifically noted that Radee was victimizing me. Despite this finding, the Court nevertheless ruled that the alienation statute did not apply because it was for two reasons. I was in an Ohio-based marriage, and the marriage was broken up in Missouri. This is the conclusion where I raise three legal issues of error. First, in some holding, the trial court applied a narrow construction to the statute. By its expressed terms, the statute is to be applied liberally. Second, the trial court erred by applying a mashup of two different legal concepts, choice of law and extraterritorial effect. When the record is clear, defendant waived both of those merit-based arguments. They are not jurisdictional, they are merit-based, and they were waived. As I will discuss in more detail, defendant still to this day claims she didn't even raise choice of law as an issue, but does claim that the Court did not engage in any choice of law analysis. While she is right she waived, she is wrong about the analysis. The Court's holding clearly focuses on choice of law because the Court held that the alienation statute unfortunately could not apply, which is a different conclusion than if this is an extraterritorial analysis, in which case the Court would have said it applies, but you didn't meet the standards. Here the Court specifically said alienation statute doesn't apply. That's a choice of law issue. And as a third error, the Court's mashup of two different tests, the alienation or excuse me, the choice of law and the extraterritorial effect, did not follow Illinois law with respect to either test. Meaning even if this Court was free to apply either test in defendant's waiver, the Court erred by applying only parts of each of the tests without following the required factors of either. Thus these questions of law, which this Court reviews de novo, demonstrate that the Court committed legal error. As such, I ask that you overturn the Court's conclusion and that alienation statute did not apply and remand to the trial court for damages. As to assignment of error one, the trial court clearly applied the wrong standard. The Illinois alienation statute states by express language it is to be liberally construed. That's at 740 Illinois at 5-7. The Court in its quoting stated just the opposite. It applied a narrow construction standard that it believed it was required to apply. Frankly, the Court just applied the wrong standard of construction. That's legal error. The case that supports that is Accentura v. Vacationland. As to assignment of error number two, Rady has waived both the choice of law and extraterritorial issues. These are merit-based questions that she had every opportunity during the seven years of this litigation with her three law firms, could have raised and chose not to. The parties agree that this issue is also a de novo review. It's an issue of law. Both choice of law and the extraterritorial application are merit-based issues, not jurisdictional issues. His amendment waived both, starting with choice of law. Rady actually concedes this point. That concession is fatal. She concedes on page 20 and 21 of her brief that she did not raise a choice of law argument. Her concession is actually consistent with the record below, which demonstrates that she did not file any choice of law motion or otherwise engage the Court on this issue. As such, this merit-based question is waived. This is a fatal concession for her because the trial court held that the alienation statute, quote, didn't apply, meaning the trial court's ultimate holding was based on the decision that Illinois law did not apply. Since Rady agrees that she waived the choice of law issue, the trial court erred in its finding. Rady expressly concedes that point on page 25 of her brief, on 21 and 20 of her brief. Thus, it's uncontested that she waived choice of law. Instead, defendant put all her eggs in one basket, arguing that she raised and the trial court considered the issue of extraterritorial application of the alienation statute. But her arguments are easily undercut by the Court's own finding and her own filings. First, on page 3 of the decision, again, the Court held specifically that Rady glossed over the extraterritorial issue, but that the trial court was not comfortable doing so. Second, the record demonstrates that Rady failed to raise the extraterritorial effect of the alienation statute at any stage in this litigation, a fact that Rady herself concedes. Specifically, Rady's brief and her reply brief point to absolutely nothing, no motion, no pretrial hearing, no disclosure in her pretrial bench brief, no identification in her opening argument that she raised the issue of extraterritorial application. In fact, her own proposed findings of fact and conclusion of law expressly waived this issue at page 3. It says, and I quote, Despite this Court's serious concerns about jurisdiction, given that almost all of the alleged conduct occurs outside of Illinois, the Court does not need to rely upon this jurisdictional argument or otherwise complete a choice of law analysis. That's February 12, 2024, proposed determination. In contrast to her arguments, the Avery case, upon which Ms. Rady relies, it is clear that the party challenging an extraterritorial application of the fraud statute did so before trial and the Court held a pretrial hearing. Clearly, nothing like that happened in this case. The only document, interestingly enough, that Rady points to where she even raises this extraterritorial issue is in a March 19, 2024, and this is important because it was three months after trial, i.e., I can't put on evidence to disprove what she's saying, in response to a bench brief. Rady claims that she asked the Court, she asked the Court to consider this legal argument, but that representation is false. At the close of trial, the Court asked for two things. The Court asked the parties to file proposed findings of fact and conclusions of law, which both parties did on February 12. The Court also granted me a bench brief because Rady filed one before trial, even though she wasn't ordered to do so, so the judge thought it was fair that I should have a bench brief, which I filed. Ms. Rady's response, where she raises the extraterritorial issue for the first time, was filed in response to my bench brief post-trial. That response should have never been filed. It was completely improper, and she was responding to a bench brief that the judge allowed me to file because she had done one before trial. But even if she had, and even if the judge had allowed, or excuse me, if it was appropriate for her to raise it at this issue, it's not a jurisdictional question, and there has to be a merit-based question that's waivable, and in this case, pre-trial and at trial, she waived that. And the case that supports this is Samici v. American Bank and Trust. Here it is clear that Rady didn't raise the extraterritorial question at any point during the seven years of this case. As such, she waived. The trial court should not have sua sponte considered an issue in absence of it being raised. That's reversible error. And as a final point, the court's application of extraterritorial reach in absence of a motion to do so violates plaintiff due process rights because we both made choices at trial, and we presented our case at trial based on what was in front of the judge. And during trial, I focused on the elements of the alienation statute, not the extraterritorial application because Rady didn't raise the issue. As a final assignment of error, there is just plain error that the alienation statute just doesn't apply here. The parties, again, agree that this is a legal question subject to de novo review. And here my argument is that the trial court said a couple of different things. I'm going to engage in an analysis that looks at choice of law issues and that looks at extraterritorial application issues. Defendant says no. That court only looked at extraterritorial issues. But as I've already explained, the court held that the alienation statute does not apply. That points to a choice of law analysis, not an extraterritorial analysis. Additionally, the court highlighted the location of my marriage as Ohio as one of only two factors it based its ruling against me on. Location of marriage isn't a factor under the extraterritorial test. It is a factor under the choice of law test, but only for standard torts. So the judge applied the standard tort concept for a basic tort, but not an interference with marriage tort. He applied the test for in restatement 145, which is for standard torts. For interference with marriage torts, it's 154. The standard's different. So the court used the wrong standard. He mashed up two different tests, and then he applied the wrong test for the tort claim, which should have been a restatement 154 case. He used the 145. The court's application of the incorrect choice of law test is legal error yet again. Turning towards the extraterritorial issue, the trial court did reference extraterritorial reach in its decision, but then the trial court failed to apply the test that applies. The test that applies for extraterritorial reach is whether the events underlying the claim took place primarily and substantially in Illinois. That's the Avery case that's cited by defendant. I agree. The trial court never identified this test, and it didn't apply it. Instead, it held that, quote, the most significant events of the alleged seduction occurred in Missouri. That's not the test. The Avery sets the test as primary and substantially in Illinois. The only relevance that Missouri has to this case is that the defendant met my husband at the Forsyth offices in St. Louis, where they both worked. Both defendant and Robert denied that there was any sexual activity that occurred in Missouri, and there was no seduction. In contrast, my brief points out pages and pages of evidence pointing to Illinois as the place where the events underlying the claims primarily and substantially took place. As a final key point, Your Honors, the trial court's denial of Rady's motion for directed verdict in this case is dispositive. Specifically, the record demonstrates that Rady called two of three of her witnesses in her defense case in my case in chief, which the judge and I allowed to do. After those two defense witnesses testified in my case in chief, she moved for directed verdict. It was denied. So when defendants' briefing talked about directed verdict, they weren't using the right standard. The right standard for a bench trial is twofold. I had to meet my prima facie case, which the judge clearly determined that I had. Number two, the judge weighed evidence, not most favorably to me, but most favorably to her, and denied directed verdict. Therefore, I had already demonstrated that the acts underlying the claims primarily and substantially took place in Illinois. The directed verdict being denied made that point clear. In response, Rady only called one more witness, my ex-husband, who the judge called a liar, who Rady herself called a liar, and certainly I call a liar. So the one witness that she's now hanging her hat on is the only place we all agree. He's a liar. The judge said so. As my time is short, I just want to also raise that I have a motion pending with this Court to grant me the right to supplement the record for our proposed findings of fact and conclusions of law. Both parties filed them, but they were filed with the judge in exchange. They were not part of the record because they weren't filed in the docket. Your Honor, I see that my time is done. May I finish? They were not filed in the docket. But it's very routine for appellate courts to look at findings of fact and conclusions of law for the parties to flesh out the issues below. And in support, I say Wells Fargo Bank, the EnviroBusiness, Apollo v. Jordan, and Trull v. Taylor. Thank you, Your Honors, very much for the time. Any questions? I do. Yes, sir. Making note to myself.  Just to touch on a couple things. When you're talking about the defendant addressing this choice of law or the territorial issue, you bring up that that was only brought up in a response to your brief after. But I just want to be clear because I've got a portion of the transcript where the judge brings the issue to light before you all get started in the case. It basically says, now if you've got a case later, that's why I'm going to have you guys brief it. So I'm assuming at some point, and the record is huge, and I'll be honest, I haven't read through the whole thing, the trial judge said, I want you to brief this issue, and that's how it came to light that it was brought up after the fact, and you were given the time. So both parties were given the time to file a brief to address that issue after the case was heard. Respectfully, Your Honor, no, that is not correct. The judge did bring it up before trial and said that I have this concern about choice of law, and this is a concern that I have as a legal issue. But at no point then, after raising that issue, did Brady bring a motion bringing that issue before the court, and to your point, he did say, I'll have some briefings, but at the end, and this is why I raised this point earlier, Your Honor, at the end of the trial, he changed his mind. He said, I want two things. I want findings of fact, conclusions of law, and I want, you know, defendant had a chance to file a bench brief, April, you get the same opportunity. He did not order, as Brady's brief falsely states, he did not order a briefing on this issue. Okay. She's the response, he did so, and the record is very clear on this issue, Your Honor. Yeah, I don't dispute that there was never anything filed prior. I mean, not that I could find. Correct. And then, and I'll ask opposing counsel kind of the same thing. I mean, let's just be honest. The trial judge should have either just ruled on the merits or ruled on this choice of law. He talked about a mashup. He made a mashup with the court. He talked about merits a little bit, kind of alluded to how he was going, but then said, yeah, but I'm going to do this instead. Yeah. So the question to both of you, if it gets affirmed, if this matter is affirmed, then you can file a PLA and, you know, it goes that way. But if it is reversed, what do you believe the next step would be? I believe that the next step is that this court reverses for the assessment of damages because he made clear in his decision the alienation statute had been met and Defendant Rady had been found to violate the statute. As to the mashup of the choice of law extraterritorial analysis, it was a waived issue. Even if it wasn't a waived issue, there is plenty of evidence in the record to support that the primary and substantial events happened in Illinois and that she never raised choice of law and the judge never picked another state where choice of law would apply. So it should be sent back just for the assessment of damages. However, if the court thinks that that might be a little strident, the other option is to send it back with instructions to reopen the case to present the actual issue. Because, again, in Avery, Avery instructs this was a pretrial hearing to determine whether or not it goes forward. And in this case, the entire hearing went forward. And I rightly focused on the elements of the alienation because that, frankly, was all that was in front of the court at that time because of the waiver. Right. And that's where I'm kind of getting to is if it is sent back, obviously you have had several days of trial. Five. Yeah. But I would think that the judge would need to possibly make specific findings, do all these things, and then get to this issue of what damages might be. Correct. So without having a full blown new trial. Right. Because that's already been presented. Now, that would be up to the trial court, obviously, to decide if they wanted anything more. Right. But that would be up to the trial court to decide. I think that is a fair reading, Your Honor. The only distinction I would make is that I think it would be unfair from a due process perspective that I presented a case focused intently on the elements because that's where the case took us by trial. And if we're going to reopen it and look at other things, like whether or not more events happened out of state versus in, there would need to be some, in my opinion, some extra factual testimony. And I don't dispute that. That's why I say that would be up for the trial court to decide if anything more would be needed to make the record clear and then get to the next step. Correct, Your Honor. Yes, I agree with that. Thank you. Absolutely. Thank you, Your Honor.  I believe you may proceed. Please identify yourself for the record. My name is Dave. My name is Dave Lido. I represent Defendant Ray in this matter. And I'd like to just talk about the statute itself. Obviously, we have a statutory claim and cause of action. It was brought by Ms. Moore in Illinois, and the only cause of action was an Illinois state statute. She's identified the elements that she must prove, love for the spouse, by the plaintiff or love for the ablated spouse for the plaintiff, over acts that must be willful and intentional. It is not sufficient that a relationship took place with a married person and or their sex. There must be an intentional showing to be an over act to meet that element. I have consistently argued that one plaintiff never met her burden on the first element, and I think the record supports that. And, in fact, the trial court never addressed that. I think that's critical. We'll get to that in a second. In fact, when there was a discussion on additional documents from the Ohio Divorce Court that would bolster that and add some additional evidence by judicial notice, the court specifically in its ruling on page 2 of the footnote said, number one, since this court doesn't find that relevant to this decision, those excerpts are stricken. There's no mention of any statement about the health of the marriage or that it's found in favor of plaintiff on that element. Frankly, the trial court's been solely on potential over conduct and whether the extraterritorial application would apply. And, to be clear, this isn't an Ohio marriage between two Ohio residents. It was short and volatile. We'll get to that. And Robert Moore did begin a relationship with an employee. It is undisputed that that relationship began in Missouri at the headquarters of Forsythe. They went on dates there, numerous dates, and the court ultimately found the genesis of that relationship occurred in Missouri. And, therefore, he didn't say the emanation of affection case did not apply based on choice of law. He says to the facts of this case. After assessing the facts of the case to determine where is the genesis, where is the substantial and primary portions of that, quote, unquote, transaction that we'll talk about. The court does have jurisdiction here. There was, I mean, Defendant Ray Day was a resident of Illinois. They did meet each other in Illinois. They did have conduct in Illinois. It was much later. It's not like there was a jurisdictional issue that needed to be addressed at the outset. The only question ultimately for the court was going to be, after he made a determination there were overacts, was there, in fact, sufficient connection, i.e., a substantial and primary connection, that this transaction occurred in Illinois? The court ultimately said it did not. And when we look at the three arguments that the plaintiff made, first she talks about a narrow construction. Obviously, the court mentioned that on page three. The courts have indicated that the alienation of affection statute is to be given narrow construction, employ a narrow construction analysis. This court finds the alienation of affection statute does not intend to have extra-territorial effect. I believe what the court is doing is directly applying Avery, as it was directed to do by me. I think, Justice, you are correct. The court brought this issue up at the outset. It had concerns about this. Frankly, I had concerns about this, but I've always taken the position that, regardless, that is step three of any analysis. The plaintiff must meet her burden on element number one, health and marriage. She must then meet her burden on element number two, but not just the fact of her relationship, not mere participation. If you look at the case law, the side of my brief, Morbita v. Gomez, it's a seminal case on alienation of affection. In that case, the defendant knowingly participated in a relationship with a married man, knew he was married, had sexual conduct with him, and the court said, while this behavior may be morally reprehensible, it is not actionable. There must be an intent to harm. And the court had to find that harm before it could even understand if overconduct could apply extra-territorially. So I think there is a step analysis that must be taking place here. The plaintiff talks about narrow construction, but she doesn't identify anything else or how it impacted this case. I think the most critical issue is whether there was truly a choice-of-law-assessed, extra-territorial mash-up, sua sponte. I have never taken the position that there should be a choice-of-law analysis here. Ultimately, the only decision is going to be whether the Illinois statute does apply to the facts of this case. If you would look, the other cases where there was conduct between Mr. Moore and Defendant Rayday, Ohio, Missouri, Florida, New York. Ohio abolished his alienation statute in 1978. Missouri in 2003. Florida, 2012. New York, 2014. A choice-of-law analysis would do nothing but give the same result that we have here. There is no cause of action for plaintiff here, and she cannot recover. Ultimately, though, at the outset, the court asked, I have concerns about this. I want you to address them. I will expect briefing on this issue. Plaintiff filed a brief. I filed a brief. She didn't file a motion to strike. The court never struck it. The court accepted it. It was very clear that the court expected us to address this to him. I filed a brief that specifically outlined Avery. In fact, it was filed as requested by the court, and I noted specifically, clearly the legislature has declared the policy position is to protect the state and the people of the state. Most critically, the Illinois Supreme Court has confirmed the longstanding rule of statutory construction in Illinois, the statute is with an extraterritorial effect, and there's a clear intent in this respect appears in the express provisions of the statute. There is no such express provisions in this statute. Furthermore, additional cases in Illinois or courts who have assessed the extraterritorial application of Avery, we've got Morrison v. Morrison case in the Seventh Circuit. That's the consumer fraud case. LG v. Whirlpool was a 2011 Northern District Uniform Deceptive Trade Practices Act case. McKnight v. United, that's a GIPA case. Johnson v. Tapor, a BIPA case. All of these apply and agree that the Avery analysis was the critical analysis for this issue specifically. Now, once I raise that to the court, I think we need to look at Avery in detail and find out exactly what did the Avery standards state. Avery was a consumer fraud case, and it was brought up, this issue of extraterritoriality, at a class certification hearing. That's critical because normally we would never have those types of hearings early on. We would identify the merits of the claims and make this application at trial. This was done early where they discussed those, discussed the same standards, but they had to do it early because it was a class search stage. Avery went through and said, due to the circumstances of the transaction, occurred primarily and substantially in Illinois. The court said there is no by-line test because, quote-unquote, transaction can be highly factual. It can also occur in a number of jurisdictions. We must look at that as a whole. In this case, there were multiple states where Defendant Rade and Mr. Moore did make contact with each other. That being said, the court said the location of the deception, and in that case the location of the deception and the injury were the controlling factors. In that case, where was the misrepresentation about the use of non-OEM parts made? Out-of-state. Where was the injury to those plaintiffs? Also out-of-state. That being said, if you look, she says that the court brought up the plaintiff's residence, but if you look at Avery, Avery is very clear that they do look at that in the totality of its analysis. It states Avery resides in Louisiana, not in Illinois. His car was garaged in Louisiana, not in Illinois. The alleged deception in this case, not in Illinois. It talks about the locus. Now, while it does also talk about the location of Defendant, in that case, at the farm because they were headquartered in Illinois, one of the claims was that because these deceptive trade practices were emanated or thought up in Illinois, therefore it would have relevance. The court said, while it may be relevant, as with the Defendant's location or resident's, the controlling factor was that transaction. If you look at the other cases that have applied this, the standards that they cite to Avery, the Morrison case, and the LG v. Work will specifically cite the plaintiff's residence as a critical factor in the test, where the conduct occurred, the deceptive conduct, and where the damages occurred. In this case, the plaintiff is an Ohio resident. The deception, as the court identified, was in Missouri. We'll get to that. And any damage occurred to her marriage in Ohio. We simply do not meet this test. At the conclusion, what Avery said was, we do not apply, because the extraterritorial analysis has been made, and either it being this transaction to have occurred outside of Illinois, it does not apply to plaintiff's causes of action, i.e. to the facts of this case, just as the trial court had done in this case. We need to look then at what the claims are because the court talked about specific things. One, where the marriage was, Ohio. And then, two, the genesis of this act of seduction. I will disagree with the act of seduction. I will disagree with it all day. I think the record is clear. Ms. Brady was a participant in a relationship. That being said, you do not need to look at the character of the conduct to determine its genesis and its location. Here, Mr. Moore said nothing about what Ms. Bott said, nothing about the fact that the trial court determined. They met at the Foresight offices of Missouri. They went on dates there. They were physically intimate there. They returned there. At the first date when they were together, assume for me, the defendant, Brady, even seduced Robert Moore. Do you remember that assumption? At the first date, he's wearing a wedding ring. They go on a second date. At that time, he's not wearing a wedding ring, and he tells her, I am getting a divorce. At that point, nothing had occurred outside of Missouri, not one thing, yet we have an act, a physical act of no longer wearing a wedding ring and a word statement, I am getting a divorce. To the extent that there is an injury, we've got a deception, an act of seduction, and now we have an injury, a specific injury, impact on this marriage. All of this occurred in Missouri before anything. Not one additional thing may have happened in Illinois. The court went on to say, yes, they went to Florida. Yes, they went to New York. They had sex in Florida. They may have even had sex in Illinois. But he said, as far as this court can tell, the only thing that occurred in Illinois was sexual conduct. Sex alone is not actionable. It's not sufficient. I cite the Wheeler v. Fox case. It's very clear on this issue. And the court said the genesis of this relationship, the most significant portions of this relationship, the act of seduction occurred in Missouri. And then, therefore, it made the decision that the facts of this case do not apply to Avery. I think Avery is interesting because the class certification became so early and it was required too procedurally. The thing that talks about waiver, there is not one case that talks about waiver. Not one case that interprets Avery as talking about waiver. Avery itself does not talk about waiver. It simply is not there. The court specifically made no comment about a law from another case from another state. It never mentions one. It never says choice of law. And then, most critically, the Avery discussion talked about choice of law in conjunction with this extraterritorial. If you look at its analysis, and I've cited my brief, but they state we are going to do this extraterritorial analysis first, and they state, I quote, a determination by this court that the Consumer Fraud Act does not apply by its own terms to the out-of-state transaction issue in this case would render it unnecessary to address State Farm's choice of law and constitutional arguments. Accordingly, we consider scope of this EFA first. They did that, and they specifically said, because we have found this way, we've applied it as required for the extraterritorial limitations. It does not apply to the facts of this case. A choice of law analysis is not necessary. That's exactly what I asked the court to do when he asked us for briefing on this issue specifically. I cited to him the case. I said, this is the extraterritorial analysis. You do not need a choice of law analysis. The court clearly did so in this case. You know, one of the public policy considerations that needs to be made is, you know, why would we do this in terms of why take this narrow statutory analysis? I think the Whirlpool case talks about it. Why apply an extraterritorial analysis in terms of considering outside conduct when it might or could impose laws upon states that may or may not have those same laws? What plaintiff would ask you to do here would say, well, we didn't look at choice of law in a vacuum and apply one of those. Those other states do not even have these statutes anymore. And it would be against public policy for this Illinois court or any Illinois court to apply outside of state conduct and make it actionable in Illinois. And I think that's exactly what this court did. I'm running out of time. I'll save it. But I think the critical issue, at least as it relates to the court's analysis, was it had concerns. I've always argued the plaintiff has not met number one or number two. I'll talk about number one when I come back. But at the end of the day, only after she met those two elements did it become necessary to apply this extraterritoriality. He decided, you know what, I'm just going to go to the end. I don't really like his order. I think it's not very clear. But ultimately he did the right thing in applying Avery correctly and said it does not apply to the facts of this case to a relationship that occurred outside of this state. Plaintiff's talked about certain conduct that occurred in Illinois. All of this happened after that change in behavior and an injury. The proverbial ship had sailed, the train had left the tracks, and nothing else was going to change an injury that occurred, if any. You had a question I think that you wanted to address if I've not addressed it already? I think so. Again, it's kind of to both of you. If it goes back, if it goes back, kind of what happens then, what happens next? Well, I think, Judge, a couple of things. It's very clear that the trial court that is never addressed the issue of health of marriage. It's clear because it's one not in the order. It's also clear because he specifically states that certain exhibits that might be related to the health of that marriage, they were submitted solely for that purpose, were stricken. And he states they are not relevant to the decision here. I think the court realized that he didn't have to. And frankly, I mean, it's talking about very personal matters. I don't think he wanted to disparage anyone. He found a result that he thought was appropriate. And albeit it's appropriate, but it requires him to say there was conduct that was actionable. That's the second element, not the first one on the part of defendant rating. So if this were to go back, I think there would have to be at least a ruling based on the record that was before him that plaintiff did or did not meet her burden on that health. Number two, if it were to go back, I think there would need to be instruction on the extraterritorial analysis and maybe a more thorough analysis of all events. It's clear the court considered those because it talks about activities in other states. I don't think it was very well articulated. Perhaps. And frankly, there's an idea of concession of damages. Frankly, plaintiff put up none. We've denied it the entire time, and there has been no showing of actual damages. If you look at the case law, it requires a showing of actual damages. She put up her husband's salary. There was no evidence at the trial court or anywhere else that suggests that, you know, I missed out on X amount or, you know, he made $10 million, but, I mean, I don't make $10 million, but I think we all know we get a salary, but what we bring home is one thing, and what someone may have missed out based on conduct. Assume she missed out on $200,000 or $1 million. There's nothing in evidence to show that. So she's either way of that, and we need to go back on that. So, I mean, I think the court could and should affirm this, but to the extent it goes back, I think there's a lot of work to do, unfortunately, on all three elements, to be frank. Thank you. Rebuttal. Your Honor, I'm going to start with the point of damages just very quickly. I've demonstrated with my husband's tax return that it was $10 million a year. That is what the case law says I have to show to show actual damages. He doesn't like it, and his client doesn't like it. They could have put on that case. They didn't. That issue has sailed, as has the issue of intent, as has the issue of whether or not there was a marriage that was loving. The marriage being loving and the divorce decree in Ohio don't intersect. The judge said it wasn't relevant because Mr. Lido, on behalf of his client, set the timeline for the measuring stick of love and affection between the spouses as April, May of 2015. There was a mountain of evidence, the $1.5 million house, trying to have a baby, a three-page love note to me, going to the Kentucky Derby, dozens of pictures of us kissing that demonstrate the love and affection in our marriage. They showed nothing other than Rob Moore's words that he was putting it all on. And, again, the judge caught him a liar, I caught him a liar, so did she. That ship has sailed, too. The fact that the judge didn't have specific findings is of no relevance because the judge doesn't have to, number one. Number two, she had seven days to ask for them and didn't. As to the final issue, this issue of intent. Occam's razor, right? This isn't hard. This woman is a woman who has a pattern of manipulative behavior who likes money. The judge made that point twice in a three-page decision. She's losing her job, she eyeballs up the new CEO, she chases him around the country, then she sends anonymous letters to me in the mail. He breaks up with her. Two weeks later, a letter hits Forsythe's desk and they give her $100,000. Occam's razor, straight line. There's no question or avert acts. So let's go back, then, to my assignments of error, which are de novo, not against the manifest weight of the evidence, as all Dan's are. Dan said, the judge instructed us to file a brief, I filed a brief, she claimed to file a brief. That's not what happened. Defendant did not file a post-trial brief. I'm looking at the docket right here. I'm looking at the record. The record says, more bench brief, 2-13-2024 at C-3187. A month later, actually six weeks later, defendant files on March 22, 2024, after I have no more pleadings left, defendant's response to plaintiff's bench brief at C-3273. There weren't competing briefs. This was a him cherry-picking every single thing that I had in front of a judge, taking six weeks and then going, oh, gosh, there is a big problem here. We have a real problem with this judge and this Avery is my Hail Mary. That doesn't work that way. That's a violation of due process. This clearly was an issue that they had seven years to put in front of this judge and chose not to. That was their choice. As you heard Van say, no, I was focused on the elements. So was I. So that is what he lives with, is the elements. As to the relevance of the divorce decree in Ohio, and he, in his reply brief, attached two Missouri cases that I wasn't a party to either when I asked this court to take judicial notice. Unfortunately for him, case law is pretty clear that when you attach something to a reply brief and you don't file a motion asking for it to be in the record, it's not. So I would ask that the court strike those exhibits to the reply. And the judicial notice, I wasn't in those cases. I had no opportunity to respond to those cases at trial, which I could have done. So it would be, again, a violation of my due process rights if those cases were considered. With respect to the claims that Rady makes in her brief, I would just ask that the court review my filings and remember that this is on all of his assignments of error are manifest weight of the evidence. This trial judge was thorough. He spent five days with these witnesses. He weighed credibility. He weighed the credibility of all of them, as I point out, on the second day. He made Miss Rady stand up a second time and be sworn in a second time because he didn't believe she was credible. He called Mr. Moore a liar. As did I. As did she. Her entire case rests on the words of two people that this judge clearly had every opportunity to look at, to listen to, and to determine whether or not they're liars. He did so. He absolutely did so. And he absolutely determined that Miss Rady's conduct was intentional. She sent me letters in the U.S. mail saying horrible things about why my husband doesn't love me and where or where is he. You can look at them. They're all in the record, and some are attached to my merit brief. They were just sad and depressing, and this woman had every intent to steal my husband, and she did so. Great. Now she can pay the price. Thank you, Your Honors. Final questions? No. Thank you. Two things I want to touch on. Avery in his statutory interpretation is a de novo review. We've talked about that. But obviously the court's application of those facts, that Avery shall be applied extraterritorially, that is a de novo review. The determination of those facts and application, I believe that would be a de novo. He determined specific factual findings to make that determination of its application. I think that would be a manifest wake based on that factual determination, its application of those facts to the law. The first element has to be met. It's not been met. The record is thorough. I was very thorough. We have a short volatile marriage of two years. There's abuse. There is infidelity on the part of Mr. Moore. There are ultimatums about an IVF situation where Ms. Moore required him or asked him to use a donor egg, and he testified, and it's been unrefuted, that the time he first met Ms. Rayday, he had no love and affection for Ms. Moore. That is unrefuted in his actions and the conduct. And frankly, this is not me pulling things out. This is Ms. Moore's own evidence. She brought up infidelity on the part of Mr. Moore. She brought up the abuse. She brought up these things. She has not and cannot meet that element. Some of the things is overconduct, and I think that the court identified these letters. And he said, as far as the court can tell, there's no one else I think could have sent those. That being said, if you look at the evidence, there's two sets of letters. Some were anonymous, that there's no evidence of envelopes. There's no evidence of the date. When Ms. Moore was asked to produce those, she couldn't. When Mr. Moore, her husband, asked for them, can I get these checked by the police, she refused to do so. Regardless, she says they were postmarked from states outside of Illinois, but she still doesn't have those. But then we have another letter. On September 1st, another anonymous letter was sent to Foresight Energy. On the early morning hours of September 1st, Ms. Moore and Mr. Moore were texting back and forth. She says, you have an obligation to tell Rashtabh Uttar about this and the board. He refuses. He says, I'm not going to do it. The next day, a letter dated September 1 is sent anonymously to Rashtabh Uttar informing her of the affair. It also states that Robert Moore and Defendant Radey are misappropriating resources. So not only does it talk about an affair, but it talks about potential criminal action or conduct by both parties. Third, there is absolute evidence that Ms. Radey, or I'm sorry, Ms. Moore, had a letter that Ms. Radey sent to Mr. Moore in the mail. She had that. She had it in her possession. We have testimony about that. And I asked her about it, and I impeached her on it when she said, yes, I got that from Rob's stuff. It was attached to this anonymous letter to Rashtabh Uttar. The same Rashtabh Uttar who Ms. Moore said, you need to tell them about this. When he refused, an anonymous letter shows up. You know what? I will find it. I think the evidence is crystal clear that the plaintiff herself sent that letter to Rashtabh Uttar. There is no evidence, and the plaintiff concedes this, that defendant sent any letters of any kind. I find it almost impossible that we have clear evidence that Ms. Moore sent one letter, yet someone else, possibly defendant, sent another one. Ms. Moore was working with Defendant Radey's ex-boyfriend during dependency of this, was getting information from him, was using that information, and in the summer of 2015 had hired a lawyer to assess a potential alienation affections case. I think this is the woman who was building the case. She sped up with her husband who had, frankly, cheated on her twice. She put it into evidence. It happened again, and the wheels began in motion. I think, frankly, that was one of my errors, some of the errors of the court. He, frankly, lacked the evidence to make a determination that Defendant Radey could have sent those letters. I stand on the brief, but I think the evidence is very clear that, at minimum, he can't find the threshold finding that she did so. And the last thing that I will say is, the plaintiff talks about the elements. All she has to do is put in tax records. She must show actual damages. That was never done so. She has to show health of marriage. That was never done nor determined by the court. And I think, regardless, the court got it right at the end of the day. I don't like its order. I, frankly, think it's a little jumbled. I don't think he was as clear as he needed to be. But there's never a choice of law discussion. It's only extraterritorial. And, frankly, the fact that I filed it as a response, the court asked us to do that. The plaintiff submitted it. I submitted my briefing on the issue as requested by the court. There was never a, you can do it this way, you can do it this way. The court said, I would like that briefing. I complied with it. The plaintiff never filed a motion to strike. The court never articulated how he wanted it. It was clear I addressed the issue of bravery to this court, specifically asked that he apply it. Prior to any time any judgment was entered, it was clear he assessed it and applied it in this case. Questions? Of course, I wouldn't comment. You would obviously comment. I want to thank you for your oral arguments. That, to be honest, has helped clarify some of these issues. A lot of times oral arguments are kind of a regurgitation of what we can read. But you all, both of you, did a great job to flesh out these issues. I greatly appreciate it. On a completely different note, I know you're from out of state. I don't know if you're an Abraham Lincoln fan, but Abraham Lincoln stood right there, his last oral argument before he went off to politics. There's some historical things downstairs. If you're here and have time, I would encourage whoever to kind of look around. It's kind of a neat historical building. I don't mean to steal the presiding thunder, but I wouldn't want you guys to get out of here without at least having that opportunity to take in some of that history. Thank you both. Thank you, Justice Boehme. All right, we've answered all those comments. We will take this matter under advisement and issue a ruling in due course.